UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,      :      INDICTMENT

       -v.-            :      S1 13 Cr. 518 (KPF)

GLAFIRA ROSALES,         :
   a/k/a "Glafira Gonzales,"
   a/k/a "Glafira Rosales Rojas," :

      Defendant.       :

- - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8|14|13

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.    From in or about 1986 until in or about January 2009, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, was a permanent resident of the United States, having previously emigrated from Mexico.  In or about January 2009, ROSALES became a citizen of the United States.  ROSALES is a dual citizen of Mexico and the United States.  ROSALES maintains a residence in Sands Point, New York. ROSALES has been a U.S. taxpayer since in or about 1986.

2.    A co-conspirator not named as a defendant herein ("CC-1") is a citizen of Spain.  At various times relevant to this Indictment, CC-1 was the boyfriend of GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant.

3.    King's Fine Arts, Inc. ("King's Fine Arts") was a corporation formed under the laws of the State of New York in or about July 1995.  From in or about 1995 through in or about 2010, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 operated King's Fine Arts as a dealer of fine art.

4.    Glafira Rosales Fine Arts LLC ("Glafira Rosales Fine Arts") is a limited liability company formed under the laws of the State of New York in or about October 2006.  From at least in or about 2006 through at least in or about 2009, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 operated Glafira Rosales Fine Arts as a dealer of fine art.

5.    King's Fine Arts and Glafira Rosales Fine Arts dealt in works of art, primarily paintings.  Among other things, King's Fine Arts and Glafira Rosales Fine Arts sold a substantial number of works of art that GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 claimed, in communicating with the purchasers and prospective purchasers of the works of art, were by the hand of some of the most acclaimed abstract expressionist artists of the twentieth century, including Mark Rothko, Jackson

2

Pollock, Willem de Kooning, Robert Motherwell, Barnett Newman, Sam Francis, and Franz Kline.

6.    A person who resides in Queens, New York, is a painter (the "Painter") who created fake works of art, including approximately 63 works of art (collectively, the "Fake Works") that were sold by GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 to two Manhattan-based art galleries, as set forth more fully below. The Fake Works were primarily paintings.  The Painter maintains a studio within his Queens home and in the garage located on the property of his Queens home.  The Painter has a formal educational background in art, including courses in painting, drawing, lithography, and graphics, from an art school in Manhattan.  The Painter and CC-1 met each other after CC-1 observed the Painter selling works of art on a lower Manhattan street.

7.    Until it closed in or about 2011, a Manhattan-based art gallery ("Gallery 1") was a dealer of fine art. Gallery 1 was founded in or about the middle of the nineteenth century and was one of the most prominent dealers of fine art in the world.

8.    At all times relevant to this Indictment, a second Manhattan-based art gallery ("Gallery 2") was a prominent

3

dealer of fine art.  Gallery 2 was founded in or about 1997 by a person who had previously been associated with Gallery 1.

Overview

9.    From in or about the early 1990's through in or about 2009, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1, together with others known and unknown, conspired to sell dozens of fake works of art.  The fake works of art were created by the Painter in Queens, New York, at the specific request of CC-1.  ROSALES and CC-1 also conspired to launder the proceeds of the scheme by transferring the proceeds through foreign bank accounts. ROSALES, who was a U.S. taxpayer, also hid the income generated by her participation in the conspiracy by filing false tax returns and failing to report the existence of the foreign bank account that she controlled, as required by law.

Obligations of United States Taxpayers

10.    Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the Internal Revenue Service ("IRS").  On such return, U.S. taxpayers are obligated to report their income from any source, regardless of whether the source of their

4

income is inside or outside the United States.  In addition, on Schedule B, Line 7a, of Form 1040, if, among other things, the filer has a foreign account, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If the taxpayer answers that question in the affirmative, then the taxpayer must indicate, on Schedule B, Line 7b, the name of the particular country in which the account is located.  Schedule B, Line 7a, directs filers to consult the filing requirements, and exceptions, for a specific IRS form, Form TD F 90-22.1, described more fully in paragraph 12, below.

11.  Under applicable IRS regulations and instructions, a Schedule C is filed together with Form 1040 to report income or loss from a business that the filer of the Form 1040 operates or a profession that the filer practiced as a sole proprietor.  The Form 1040 and the Schedule C are interrelated. For example, Line 12 of Form 1040 instructs the filer to state the amount of business income or (loss) and instructs the filer to attach Schedule C or C-EZ, which is a simplified version of Schedule C.  In turn, Schedule C requires the filer to report, on Line 1, the gross receipts or sales for the filer's sole

proprietorship and, on Line 31, the net profit or loss for the filer's sole proprietorship.  Typically, the amount of business income (or loss) reported on Line 12 of Form 1040 and the net profit (or loss) reported on Line 31 of Schedule C are approximately equal.

12.  U.S. taxpayers who have a financial interest in, or signature authority over, a bank, securities, or other financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR").  The obligation to file an FBAR is separate and apart from the obligation to file a Form 1040.  The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year.  The FBAR requires that the filer include his or her taxpayer identification number, typically an individual's Social Security number, and identify the financial institution with which the account is held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

## The Bank Accounts in Spain

13.   Starting at least in or about early 1999, there
was an account held at Banco Bilbao Vizcaya Argentaria, S.A., in
Spain (the "First BBVA Account").  The account was assigned an
account number ending in -6038.  The account was held in the
name of CC-1.  GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a
"Glafira Rosales Rojas," the defendant, and CC-1's brother were
authorized to use the First BBVA Account.

14.   On or about August 17, 2006, GLAFIRA ROSALES,
a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the
defendant, opened, and caused to be opened, an account at a
branch of the bank then known as Caja Madrid in Lugo, Spain (the
"First Caja Madrid Account").  The account was assigned an
account number ending in -1789.  At the time that ROSALES
opened, and caused to be opened, the First Caja Madrid Account,
ROSALES authorized CC-1's brother to use the First Caja Madrid
Account.

15.   During every year from 2006 through and including
2011, the First Caja Madrid Account had an approximate aggregate
value of more than $10,000.  For at least the years 2010 and
2011, the high balance in the First Caja Madrid Account, which
was required to be reported to the IRS by GLAFIRA ROSALES, a/k/a
"Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the

defendant, on an FBAR, was as indicated below on the dates indicated below:

| Date | High Balance in First Caja Madrid Account |
| --- | --- |
| July 28, 2010 | $1,848,066 |
| August 19, 2011 | $1,838,958 |

16.   Starting at least in or about 2006, there was an account held at Banco Bilbao Vizcaya Argentaria, S.A., at a branch in La Coruña, Spain (the "Second BBVA Account").   The account was assigned an account number ending in -4036.   On occasion, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, indicated that the Second BBVA Account was held in the name of CC-1's brother, and on other occasions, referred to the Second BBVA Account as "my account."

**The Wire Fraud and Money Laundering Conspiracy**

17.   The provenance of a work of art is a historical record of its creation, ownership, custody, and location. Typically, the provenance includes records of transactions by which a work of art changed ownership, custody, and location. The provenance of a work of art impacts claims about the authenticity of a work, that is, whether a work of art is what

it purports to be, most importantly, whether a work is by the hand of a particular artist. Accordingly, the provenance of a work of art also affects the value of a work of art. For example, a complete provenance back to the creation of a work of art by an artist can demonstrate the authenticity of a work and, as a result, increase the value of a work of art. The converse is also true. A lack of evidence about the creation, ownership, custody, and location of a work of art can reduce the work's value.

18. From in or about the early 1990's through in or about 2009, the Painter created the Fake Works at the specific request of CC-1. CC-1 paid the Painter several thousand dollars per Fake Work. Upon receiving the Fake Works from the Painter, CC-1 would subject the Fake Works to various processes, such as heating them, cooling them, and exposing them to the elements outdoors, in an attempt to make the Fake Works seem older than, in fact, they were.

19. From in or about the early 1990's through in or about 2009, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 sold approximately 40 of the Fake Works to Gallery 1 and approximately 23 of the Fake Works to Gallery 2. The Fake Works were sold by ROSALES and CC-1, acting either through King's Fine

Arts or Glafira Rosales Fine Arts.  All of the Fake Works were
never before exhibited and previously unknown works of art.

20.  In the process of selling the Fake Works to
Gallery 1 and Gallery 2, GLAFIRA ROSALES, a/k/a "Glafira
Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-
1 made, and caused to be made, false and fraudulent
representations concerning the authenticity of the Fake Works.
ROSALES and CC-1 claimed that the Fake Works were by the hand of
some of the most famous artists of the twentieth century, such
as Mark Rothko, Jackson Pollock, Willem de Kooning, Robert
Motherwell, Barnett Newman, Sam Francis, and Franz Kline.  In
truth and in fact, and as ROSALES and CC-1 then and there knew,
the Fake Works were not by the hand of the artists that ROSALES
and CC-1 claimed and had instead been created by the Painter.

21.  Beyond the false statements about the
authenticity of the Fake Works, the false and fraudulent
statements also concerned the provenance of the Fake Works and
related, in general, to the people who purportedly owned the
Fake Works that GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a
"Glafira Rosales Rojas," the defendant, and CC-1 were selling to
Gallery 1 and Gallery 2 and how the purported owners came to own
the Fake Works.  The false and fraudulent statements were made
to Gallery 1 and Gallery 2 with the knowledge and intent that

they be repeated to, among others, purchasers and potential purchasers of the Fake Works.  The false and fraudulent statements were material to the clients of Gallery 1 and Gallery 2 who purchased most of the Fake Works (collectively, the "Victims") from Gallery 1 and Gallery 2.  Specifically:

a.   ROSALES and CC-1 falsely and fraudulently claimed that, with respect to approximately 50 of the Fake Works, ROSALES was acting as the broker or agent on behalf of a specific client who, ROSALES and CC-1 claimed, was located outside of the United States and, who she also claimed, maintained residences in, among other places, Switzerland (the "Purported Swiss Client").  ROSALES and CC-1 refused to identify the Purported Swiss Client to Gallery 1 and Gallery 2, but indicated to Gallery 1 and Gallery 2 that the Purported Swiss Client was of Eastern European descent, maintained residences in Switzerland and Mexico, wished to remain anonymous, and had inherited the works that ROSALES and CC-1 sold to Gallery 1 and Gallery 2 from a relative.  ROSALES and CC-1 further claimed that the Purported Swiss Client inherited the paintings and wanted to sell them, but wanted to remain anonymous.  In truth and in fact, the Purported Swiss Client did not exist.

b.   ROSALES and CC-1 falsely and fraudulently claimed that, with respect to approximately 13 of the Fake

11

Works, ROSALES was acting as the broker or agent on behalf of a specific client who, she claimed, was a Spanish collector of art (the "Purported Spanish Collector") and who, ROSALES and CC-1 claimed, had received the works of art from a Spanish gallery (the "Spanish Gallery"), either by purchase or by trade for goods and services.  In so doing, ROSALES and CC-1 provided to Gallery 1 and Gallery 2 documents in which the Purported Spanish Collector "certified" that the Spanish collector had received one or more of the Fake Works from the Spanish Gallery.  In truth and in fact:

> i.    The Purported Spanish Collector never owned any of the Fake Works.

> ii.   The Spanish Gallery never sold any of the Fake Works.

> iii.  The documents that ROSALES and CC-1 represented had come from the Purported Spanish Collector and that ROSALES provided to Gallery 1 and Gallery 2 were forgeries.

> c.    ROSALES and CC-1 further falsely and fraudulently claimed that a portion of the price paid by Gallery 1 and Gallery 2 was a commission to ROSALES for selling the Fake Works and that the remainder would be passed along to her clients, the Purported Swiss Client or the Purported Spanish Collector.  In truth and in fact, all or substantially all of

the proceeds of the sale of the Fake Works constituted income to ROSALES and CC-1, and ROSALES and CC-1 did not pass along a portion of the proceeds of the sales of the Fake Works to the Purported Swiss Client, who did not exist, or the Purported Spanish Collector, who never owned any of the Fake Works.

22.   The scheme was lucrative to GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1.  From in or about 1994 through in or about 2009, Gallery 1 paid over $20.7 million and Gallery 2 paid over $12.5 for the Fake Works.  From approximately 2006 through approximately 2008 alone, the proceeds of the sales of approximately a dozen of the Fake Works were over $14 million.

23.   From in or about 1994 through in or about 2009, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 typically paid the Painter several thousand dollars for each of the Fake Works. For example, CC-1 wrote the following checks, all drawn on an account maintained in the name of King's Fine Arts and all payable to the Painter, in the amounts indicated below on or about the dates indicated below and containing the notations indicated below:

13

| Date | Amount | Notation in Memo Line of Check |
|---|---|---|
| December 29, 2005 | $5,400 | "buying painting" |
| November 26, 2006 | $5,000 | "paying painting" |
| December 29, 2006 | $9,000 | "buying two paintings" |
| February 1, 2007 | $6,000 | "buying painting" |
| December 4, 2007 | $5,000 | "buying painting" |
| January 23, 2008 | $5,000 | "buying one painting" |
| February 5, 2008 | $7,000 | "buying painting" |
| February 8, 2008 | $8,000 | (none) |
| Total | $50,400 | |

In addition to these checks, on or about January 9, 2007, CC-1 caused approximately $15,000 to be wire-transferred from an account maintained by CC-1 in Spain to an account held in the name of the Painter in Queens, New York.

24.   The Fake Works also proved to be lucrative to Gallery 1 and Gallery 2.  The Victims paid Gallery 1 more than $63.7 million and Gallery 2 more than $17 million for the Fake Works.  As a result, Gallery 1 realized gross profit of approximately $43 million and Gallery 2 realized gross profit of approximately $4.5 million from the sales by Gallery 1 and Gallery 2 of the Fake Works.

14

25.   Because GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 had falsely and fraudulently represented to Gallery 1 and Gallery 2 that ROSALES was acting on behalf of the Purported Swiss Client and the Purported Spanish Collector in selling the Fake Works, from at least in or about 1999 to in or about 2009, once the sales occurred, ROSALES and CC-1 concealed and disguised the nature, location, source, ownership, and control of the proceeds of the sales of the Fake Works.  Specifically:

a.   ROSALES and CC-1 caused Gallery 1 and Gallery 2 to transfer substantial portions of the proceeds of the sales of the Fake Works to one or more foreign bank accounts, including the First BBVA Account, the Second BBVA Account, and the First Caja Madrid Account.  For example, between in or about 1998 and in or about 2005, Gallery 2 paid ROSALES and CC-1 at least approximately $6 million for some of the Fake Works by causing Gallery 2 to wire-transfer the funds to the First BBVA Account.  In addition, between in or about 1998 and in or about 2005, Gallery 1 paid ROSALES and CC-1 at least approximately $7.19 million for some of the Fake Works by causing Gallery 1 to wire-transfer the funds to the First BBVA Account.

b.    ROSALES and CC-1 transferred, and caused to be transferred, proceeds of the sales of the Fake Works from one or more foreign bank accounts, including the First BBVA Account, the Second BBVA Account, and the First Caja Madrid Account, to accounts maintained in the United States.  For example, from approximately June 2007 through December 2007, ROSALES and CC-1 caused more than $430,000 to be transferred from the First Caja Madrid Account to auction houses in the United States for the purchase of various works of art.

26.  Because proceeds of the sales of the Fake Works were the proceeds of the scheme to defraud and, at the same time, constituted income to her, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, filed U.S. individual tax returns with the IRS for at least the tax years 2006, 2007, and 2008 that falsely and fraudulently omitted all or substantially all of the income received by ROSALES as a result of the sales of the Fake Works.  Furthermore, in order to further conceal the fraudulent scheme, ROSALES willfully failed to inform the IRS of one or more foreign bank accounts in which she had a financial interest, or over which she had signature authority, and into which substantial proceeds of the scheme to defraud had been transferred.

27.   For example, between approximately March 2006 and August 2008, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1 sold, through Glafira Rosales Fine Arts, approximately 12 of the Fake Works to Gallery 1 and Gallery 2 (the "2006 to 2008 Fake Works"). Pursuant to an agreement between ROSALES and CC-1, at least approximately 50% of the proceeds of the 2006 to 2008 Fake Works were income to ROSALES.  Specifically:

a.   In 2006, ROSALES and CC-1 sold two of the 2006 to 2008 Fake Works to Gallery 1 for a total of approximately $1,275,000.  Of the total proceeds, approximately $1,196,000 was wire-transferred to the Second BBVA Account.  In 2006, ROSALES and CC-1 sold one of the 2006 to 2008 Fake Works to Gallery 2 for approximately $572,500.  Of the total proceeds, approximately $550,000 was wire-transferred to the Second BBVA Account.

b.   In 2007, ROSALES and CC-1 sold three of the 2006 to 2008 Fake Works to Gallery 1 for a total of approximately $3,080,000.  Of the total proceeds, approximately $3,024,000 was wire-transferred to the First Caja Madrid Account.  In 2007, ROSALES and CC-1 sold three of the 2006 to 2008 Fake Works to Gallery 2 for approximately $3,162,500.  Of

the total proceeds, approximately $2,780,000 was wire-transferred to the First Caja Madrid Account.

c.    In 2008, ROSALES and CC-1 sold three of the 2006 to 2008 Fake Works to Gallery 1 for a total of approximately $6,650,000.  Of the total proceeds, approximately $6,502,000 was wire-transferred to the First Caja Madrid Account.

d.    In sum, the year-by-year approximate gross receipts from sales by Glafira Rosales Fine Arts of the 2006 to 2008 Fake Works to Gallery 1 and Gallery 2 were as follows:

| Year | Gross Receipts from Sales by Glafira Rosales Fine Arts |
|------|-------------------------------------------------------|
| 2006 | $1,847,500 |
| 2007 | $6,242,500 |
| 2008 | $6,650,000 |
| Total | $14,740,000 |

**ROSALES Falsely and Fraudulently Fails to Report the Proceeds of the Fraudulent Scheme As Income on Her Tax Returns**

28.    With each of the Form 1040s for calendar years 2006, 2007, and 2008, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, included a Schedule C for Glafira Rosales Fine Arts.

18

29.  For the calendar years 2006, 2007, and 2008, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant filed, and caused to be filed, on or about the dates indicated below, a Form 1040 together with Schedule C that reported the amounts indicated below on the lines indicated below:

| Calendar Year | Approximate Date of Filing of Form 1040 and Schedule C | Form 1040, Line 12 -- Business Income or (Loss) | Form 1040, Line 22 -- Total Income | Schedule C, Line 1 -- Gross Receipts or Sales | Schedule C, Line 31 -- Net Profit or (Loss) |
|---|---|---|---|---|---|
| 2006 | January 2, 2008 | $95,135 | $95,333 | $296,418 | $95,135 |
| 2007 | January 23, 2009 | $172,557 | $172,557 | $905,086 | $172,557 |
| 2008 | February 5, 2010 | $240,327 | $240,327 | $997,402 | $240,327 |

30.  The Forms 1040 and various Schedule C forms filed by GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, for the calendar years 2006, 2007, and 2008 were false and fraudulent in that they: (a) omitted, from gross receipts or sales, substantial income received by ROSALES through her sole proprietorship, Glafira Rosales Fine Arts LLC; (b) understated the net profit of her sole proprietorship, Glafira Rosales Fine Arts LLC; (c) understated her business income; and (d) understated her total income.  For example:

a.   ROSALES reported on Schedule C, Line 1, that, in 2006, her sole proprietorship received $296,418 of gross receipts, when, in truth and in fact, ROSALES had received at least approximately $1,847,500 in gross receipts.

b.   ROSALES reported on Schedule C, Line 1, that, in 2007, her sole proprietorship received $905,086 of gross receipts, when, in truth and in fact, ROSALES had received at least approximately $6,242,500 in gross receipts.

c.   ROSALES reported on Schedule C, Line 1, that, in 2008, her sole proprietorship received $997,402 of gross receipts, when, in truth and in fact, ROSALES had received at least approximately $6,650,000 in gross receipts.

31.   For the calendar years 2009 and 2010, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, filed, and caused to be filed, on or about the dates indicated below, a Form 1040 together with Schedule B.  On Schedule B, Line 7a, of Form 1040 for the calendar years 2009 and 2010, ROSALES indicated "no" in response to the question whether, "at any time during [2009 or 2010, as the case may be]," ROSALES had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account":

20

| Calendar Year | Approximate Date of Filing of Form 1040 and Schedule B | Form 1040, Schedule B, Line 7a |
|---|---|---|
| 2009 | August 13, 2010 | No |
| 2010 | October 11, 2012 | No |

### ROSALES Willfully Fails to File FBARs In Order to Hide the Proceeds of the Fraudulent Scheme from the IRS

32. For at least calendar years 2006, 2007, 2008, 2009, 2010, and 2011, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, did not file any FBAR, as required by law, using either:

a.   the Social Security Number assigned to ROSALES;

b.   the names "Glafira Rosales," "Glafira Gonzalez," and "Glafira Rosales Rojas";

c.   the names of "Glafira Rosales Fine Arts LLC" and "King's Fine Arts, Inc."; and

d.   the Employer Identification Numbers assigned to Glafira Rosales Fine Arts and King's Fine Arts.

### Statutory Allegations

33. From in or about the early 1990's through in or about 2009, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1, together with others

known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree, together and with others, to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

34.   It was a part and an object of the conspiracy
that GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira
Rosales Rojas," the defendant, and CC-1, together with others
known and unknown, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

### Overt Acts

35.   In furtherance of the conspiracy and to effect
the illegal object thereof, the following overt acts, among
others, were committed and caused to be committed in the
Southern District of New York and elsewhere:

a.   In or about April 2006, GLAFIRA ROSALES,
a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the

defendant, executed a written document in which she warranted that a specific Fake Work was an authentic work by Robert Motherwell.

b.   On or about January 9, 2007, CC-1 caused approximately $15,000 to be wire-transferred from an account maintained by CC-1 in Spain to an account held in the name of the Painter in Queens, New York.

c.   In or about September 2007, ROSALES caused approximately $875,000 to be wire-transferred from a bank account maintained in Manhattan to a bank account maintained in Spain.

d.   On or about February 8, 2008, CC-1 wrote a check drawn on an account maintained in the name of King's Fine Arts and payable to the Painter in the amount of approximately $8,000.

e.   In or about June 2008, ROSALES executed a written document in which she warranted that a specific Fake Work was an authentic work by Mark Rothko.

f.   In or about June 2009, ROSALES caused approximately $200,000 to be transferred from the First Caja Madrid Account to CC-1.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
**(Wire Fraud)**

36.   The allegations set forth in paragraphs 1 through 32 are repeated and realleged as if set forth fully herein.

37.   From in or about the early 1990's through in or about 2009, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in connection with the sale of the Fake Works, which had been acquired by CC-1 from the Painter, ROSALES and CC-1 made, and caused to be made, false and fraudulent misrepresentations about the authenticity and provenance of the Fake Works and, as a result, transmitted, and caused to be transmitted, numerous interstate wire communications into and out of the State of New York and numerous international wire communications.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

38.   The allegations set forth in paragraphs 1 through 32 are repeated and realleged as if set forth fully herein.

39.   From at least in or about 1999 through in or about 2009, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree, together and with others, to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

40.   It was a part and an object of the conspiracy that GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, and CC-1, together with others known and unknown, willfully and knowingly, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation,

25

transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

### Overt Acts

41.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.   In or about April 2006, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, executed a written document in which she warranted that a specific Fake Work was an authentic work by Robert Motherwell.

b.   On or about January 9, 2007, CC-1 caused approximately $15,000 to be wire-transferred from an account maintained by CC-1 in Spain to an account held in the name of the Painter in Queens, New York.

c.   In or about September 2007, ROSALES caused approximately $875,000 to be wire-transferred from a bank

account maintained in Manhattan to a bank account maintained in Spain.

    d.    On or about February 8, 2008, CC-1 wrote a check drawn on an account maintained in the name of King's Fine Arts and payable to the Painter in the amount of approximately $8,000.

    e.    In or about June 2008, ROSALES executed a written document in which she warranted that a specific Fake Work was an authentic work by Mark Rothko.

    f.    In or about June 2009, ROSALES caused approximately $200,000 to be transferred from the First Caja Madrid Account to CC-1.

        (Title 18, United States Code, Section 1956(h).)

## COUNT FOUR
### (Money Laundering)

    The Grand Jury further charges:

    42.    The allegations set forth in paragraphs 1 through 32 are repeated and realleged as if set forth fully herein.

    43.    From at least in or about 1999 through in or about 2009, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, willfully and knowingly, transported, transmitted, and transferred, and attempted to

27

transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, ROSALES and CC-1 caused Gallery 1 and Gallery 2 to transfer substantial portions of the proceeds of the sales of the Fake Works to one or more foreign bank accounts, and ROSALES and CC-1 transferred, and caused to be transferred, proceeds of the sales of the Fake Works from one or more foreign bank accounts to accounts maintained in the United States.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

### COUNTS FIVE THROUGH SEVEN
### (Subscribing to False U.S. Individual Income Tax Returns)

The Grand Jury further charges:

44.   The allegations set forth in paragraphs 1 through 32 are repeated and realleged as if set forth fully herein.

28

45.   On or about the filing dates listed below, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, knowingly and willfully did make and subscribe U.S. Individual Income Tax Returns, Forms 1040, for the calendar years listed below, which returns contained and were verified by the written declaration of ROSALES that they were made under penalties of perjury, and which returns ROSALES did not believe to be true and correct as to every material matter, in that ROSALES falsely and fraudulently: (a) omitted, from gross receipts or sales, substantial income received by ROSALES through her sole proprietorship, Glafira Rosales Fine Arts LLC; (b) understated the net profit of her sole proprietorship, Glafira Rosales Fine Arts LLC; (c) understated her business income; and (d) understated her total income:

| Count | Calendar Year | Approximate Date of Filing |
|-------|---------------|----------------------------|
| Five  | 2006          | January 2, 2008            |
| Six   | 2007          | January 23, 2009           |
| Seven | 2008          | February 5, 2010           |

(Title 26, United States Code, Section 7206(1).)

29

## COUNTS EIGHT AND NINE
### (Willful Failure to File Reports of
### Foreign Bank and Financial Accounts)

The Grand Jury further charges:

46.  The allegations set forth in paragraphs 1 through 32 are repeated and realleged as if set forth fully herein.

47.  On or before the filing due dates listed below, in the Southern District of New York and elsewhere, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, did knowingly and willfully fail to file with the Commissioner of the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR") disclosing that she had a financial interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, to wit, at least one bank, securities, and other financial account in Spain, which had an aggregate value of more than $10,000 during each of the years listed below:

| Count | Calendar Year | Due Date to File FBAR | Bank |
|-------|--------------|----------------------|------|
| Eight | 2010 | June 30, 2011 | Caja Madrid |
| Nine | 2011 | June 30, 2012 | Caja Madrid |

(Title 31, United States Code, Sections 5314 and 5322(a);
Title 31, Code of Federal Regulations,
Sections 1010.350, 1010.306(c, d), and 1010.840(b).)

## FORFEITURE ALLEGATIONS

48.   As a result of committing the offenses alleged in Counts One and Two of this Indictment, to wit, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1349, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, respectively, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461, any and all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the said offense, including, but not limited to:

a.   approximately $33.2 million in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of Counts One and Two of this Indictment;

b.   all works of art purchased by ROSALES and CC-1; and

c.   the First BBVA Account; the First Caja Madrid Account; and the Second BBVA Account.

49.   As a result of committing the money laundering offenses alleged in Counts Three and Four of this Indictment, in

violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(B)(i) and 2, respectively, GLAFIRA ROSALES, a/k/a "Glafira Gonzalez," a/k/a "Glafira Rosales Rojas," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offense and all property traceable to such property, including but not limited to:

a.    approximately $33.2 million in United States currency, in that such sum in aggregate is property involved in the money laundering offense or is traceable to such property;

b.    all works of art purchasjed by ROSALES and CC-1; and

c.    the First BBVA Account; the First Caja Madrid Account; and the Second BBVA Account.

### Substitute Assets Provision

50.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of

the Court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

  (Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and (b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

GLAFIRA ROSALES,
a/k/a "Glafira Gonzalez,"
a/k/a "Glafira Rosales Rojas,"

Defendant.

## INDICTMENT

S1 13 Cr. 518 (KPF)

(Title 18, United States Code,
Sections 1343, 1349, 1956(a)(2)(B)(i)
and (h), and 2; Title 26, United States
Code, Section 7206(1); Title 31, United
States Code, Sections 5314 and 5322(a);
Title 31, Code of Federal Regulations,
Sections 1010.350, 1010.306(c, d), and
1010.840(b).)

PREET BHARARA
United States Attorney.

A TRUE BILL

*Kathleen Suceck*
Foreperson.

8/14/13
mg

S1 Fited indictment... Ellis, VSMJ